**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**HARTFORD FIRE INSURANCE
COMPANY**                                                                    **PLAINTIFF**

**V.**                              **CASE NO. 2:14-CV-2096**

**THE HARRIS COMPANY OF
FORT SMITH, INC.**                                              **DEFENDANT/
THIRD PARTY PLAINTIFF**

**V.**

**LIMESTONE DEVELOPMENT, LLC and
ARK-CON TESTING SERVICE, INC.**              **THIRD-PARTY DEFENDANTS**

<u>**OPINION AND ORDER**</u>

Currently before the Court are The Harris Company of Forth Smith's ("Harris")
Motion for Summary Judgment (Doc. 61), Ark-Con Testing Service's ("Ark-Con") Motion
for Summary Judgment (Doc. 64), Limestone Development's ("Limestone") Motion to
Set Aside Default (Doc. 68), and the various briefs accompanying and responding to
those motions. For the reasons discussed below, these motions will be adjudicated as
follows:

- Limestone's Motion to Set Aside Default (Doc. 68) is **GRANTED**. Limestone is
  **ORDERED** to respond to Harris's Counterclaim within **14 DAYS** of this Order's
  entry. Limestone is further **ORDERED** to respond to Ark-Con's Crossclaim within
  **14 DAYS** of this Order's entry.

- Harris's Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART** as to
  the curb issues, the wiring issue, and the misrepresentation claim, and **DENIED
  IN PART** as to all of the remaining issues.

1

- Ark-Con's Motion for Summary Judgment (Doc. 64) is **DENIED.**

## I.   BACKGROUND

This litigation involves a construction dispute arising from the expansion of the Fort Smith National Cemetery (the "Cemetery") in Fort Smith, Arkansas. To execute that expansion, the Federal Government contracted with Limestone to be the general contractor on the project. As an apparent requirement of the contract, Limestone obtained a performance bond from, and entered into an indemnity agreement with, Hartford Fire Insurance Company ("Hartford"). Pursuant to the bond and related indemnity agreement, Limestone assigned to Hartford all rights, title, and interest to all claims in connection with the subcontracts related to the Cemetery expansion.

On April 20, 2010, Limestone entered into a sub-contract with Defendant/Third-Party Plaintiff Harris to perform certain erosion control, demolition, earthwork, drainage work, paving, sewage, concrete work, and other work for the expansion. Around the same time, Limestone entered into a sub-contract with Third-Party Defendant Ark-Con to test the compaction rate of soil upon which various structures were to be built. Following several alleged problems in the early phases of construction, which now form the basis of this lawsuit, Limestone dismissed Harris from the worksite on February 15, 2011, and terminated the parties' sub-contract agreement in April of that year. Shortly thereafter, Limestone defaulted on its contract with the Government and Hartford stepped into Limestone's shoes pursuant to the March 1, 2010 performance bond.

After completing the Cemetery expansion in place of Limestone, Hartford brought the instant suit against Harris, alleging that Harris breached its subcontract agreement with Limestone, made misrepresentations to Limestone regarding the quality of

workmanship, materials, and professional care it exercised, and was negligent in the execution of the contract. Harris filed its Answer to Amended Complaint on June 17, 2014, denying all of Hartford's claims. Harris also commenced actions against Limestone and Ark-Con, alleging contribution, indemnity, breach of contract, and promissory estoppel against Limestone, and contribution, indemnity, and promissory estoppel against Ark-Con. Ark-Con filed its Answer to Harris's Amended Third-Party Complaint denying all claims. It also filed a Counterclaim against Harris and a Crossclaim against Limestone asserting that any damages incurred by Hartford are primarily attributable to either Harris or Limestone, and seeking an apportionment of fault or contribution. Limestone failed to respond to Harris's original and amended Third-Party Complaints, and to Ark-Con's Crossclaim.

On June 25, 2015, the Clerk of the Court filed a Notice of Default Procedures alerting counsel for Harris that Limestone failed to plead or otherwise defend against Harris's claims.[1] Harris's counsel then filed an affidavit certifying that Limestone was properly served by a private process server, followed by a Motion for Default Judgment as to Limestone on June 29, 2015. The Clerk of the Court entered default against Limestone on July 1, 2015, and this Court granted Harris's Motion for Default Judgment on August 5, 2015, deeming the issues of legal liability and responsibility set forth in Harris's Third-Party Complaint admitted.

Harris filed its Motion for Summary Judgment on August 31, 2015. The Motion first argues that summary judgment against Hartford is appropriate because, as Limestone's surety, Limestone's default is imputed onto Hartford. In the alternative, the

---

[1] Although Limestone also failed to defend against Ark-Con's Crossclaim, default judgment was not entered on that basis.

Motion contends that partial summary judgment is appropriate as to Hartford's claims based on the settlement of the Building, and alleged defects with the administration-building sidewalk, irrigation lines, grading by the storage bins and storage building, grading over the crypts, grading for the fencing, grading on both sides of "B" street, inlet grates and yard inlets, broken curbs, and wiring to the bell tower.  Also on August 31, 2015, Ark-Con filed its Motion for Summary Judgment against Harris, arguing that there is no genuine issue of material fact that it did not cause the settling of the Building.

Apparently realizing the potential consequences of Limestone's default for Hartford, Hartford's counsel, Paul Devlieger, filed a Notice of Appearance on behalf of Limestone on September 3, 2015, and moved the Court to set aside its Default Judgment on the same day. Briefing for all of the aforementioned motions has been completed, and all are now ripe for decision.

## II.  DISCUSSION

### A.  LIMESTONE'S MOTION TO SET ASIDE DEFAULT JUDGMENT

Limestone's Motion to Set Aside Default Judgment first contends that this Court erred by entering default in the first place, because Limestone was entitled to rest on Hartford's Complaint under the common-defense doctrine. Additionally, Limestone argues that the default should be lifted because doing so would not prejudice Harris, and that maintaining the default would produce a harsh or unfair result. The Court will accordingly consider, first, whether it erred in granting the default judgment, and second, whether, if properly granted, the default judgment should nonetheless be set aside.

Addressing the first matter, the Court finds that Limestone's creative attempt to benefit from the common-defense doctrine is misguided, and that the Court did not err in granting default judgment. The common-defense doctrine is an English common law doctrine that gained acceptance in the United States in the mid-1800's. *See Firestone and Rubber Co. v. Little: Overextension of the Common Defense Doctrine*, 35 Ark. L. Rev. 328, 328-29 (1981). The doctrine operates to allow a co-defendant to avoid default judgment by relying on a responsive pleading filed by another co-defendant. *E.g.*, *Sutter v. Payne*, 337 Ark. 330, 335 (1999) ("Arkansas has long recognized the common-defense doctrine, which provides that an answer that is timely filed by a co-defendant inures to the benefit of a defaulting co-defendant."). The straight-forward purpose of the doctrine is to avoid the inconsistent outcome of a court entering default judgment against one defendant, thus adjudicating him liable to the plaintiff, while a similarly situated co-defendant prevails on the merits. *See Angelo Iafrate Const., LLC v. Potashnick Const., Inc.*, 370 F.3d 715, 722 (8th Cir. 2004) ("To avoid such inconsistent results, a judgment on the merits for the answering party should accrue to the benefit of the defaulting party."); *Frow v. De La Vega*, 82 U.S. 552, 554 (1872) (opining that absent the common-defense doctrine, defaults could result in an "absurdity" where courts both sustain a charge and deem it to be entirely unfounded). Consistent with this underlying purpose, the doctrine does not apply where "liability of the defaulting party is based on independent wrongful acts or a legal theory distinct from the one under which the answering party prevailed." 370 F.3d at 722.

If Limestone and Hartford were co-defendants, it is quite likely that the common-defense doctrine would save Limestone from default. But, they are not. Hartford is the

Plaintiff in this case and Limestone is a Third-Party Defendant. Limestone tries to circumvent this facially fatal incongruity by asserting that "although couched as affirmative claims as opposed to affirmative defenses, the pleas of Hartford, that Harris was the defaulting responsible party, if proven, would operate as a defense to the claims of Harris." (Doc. 68-1, p. 2). Limestone cites no law to support its conclusion that the common-defense doctrine applies in such situations, and the Court could find none either. While the Court would stop short of assuming that the common-defense doctrine could never apply in such a case, it is confident that the doctrine does not apply here because the underlying purpose of the doctrine is not implicated. This is so because the default of a principal is imputed upon a surety "when the surety had full knowledge of the action against the principal and an opportunity to defend." *Drill South, Inc. v. Int'l Fidelity Ins. Co.,* 234 F.3d 1232, 1235 (11th Cir. 2000). Accordingly, if this Court upholds Limestone's default, the default imputes upon Hartford, eliminating any potential for inconsistency.

The parties quibble over whether Limestone's default should be imputed upon Hartford, so the Court's above conclusion warrants some explanation. The *Drill South* court declared that "the general rule that has emerged is that a surety is bound by any judgment against its principal, default or otherwise, when the surety had full knowledge of the action against the principal and an opportunity to defend." *Id.* at 1235. The reasoning behind this general rule is that when a guarantor has the right and opportunity to defend a principal as its surety and attorney-in-fact, it should not be permitted to "stand back and allow a judgment to be taken setting the amount of recovery against its principal without similarly being bound by the judgment." *Id.* at

1236. While *Drill South* notes that some law to the contrary exists, after thoroughly reviewing the cases on point, this Court is persuaded that the "general rule" referenced by *Drill South* holds. In fact, the supposedly inapposite cases are all materially distinguishable. *See Gearhart v. Pierce Enters., Inc.*, 105 Nev. 517 (1989) (distinguishable because the surety and the principal were co-defendants, so the common-defense doctrine should have prevented or delayed the imposition of the default judgment against the principal in the first place); *Fid. Nat. Bank v. Rundle*, 107 F. 227, 229 (9th Cir. 1901) (same); *Vigilanti v. Pfeiffer-Neumeyer Const. Corp.*, 25 F. Supp. 403, 405 (E.D.N.Y. 1938) (distinguishable because it was "not a case in which the sureties had the opportunity to defend, and failed to defend, an action which was brought against their principal"); *N. Jersey Sav. & Loan Ass'n. v. Wright, Egan & Assocs.*, 1987 WL 5259, at *2 (E.D. Pa. Jan. 13, 1987) (same).

Even if a default judgment against a principal could not be imputed against a surety, the Court would decline to extend the common-defense doctrine to this case. Limestone contends that the instant case is analogous to the classic situation where the doctrine applies: when a plaintiff sues two defendants and one fails to respond. The Court disagrees. Given that Hartford and Limestone are—while formally distinct— effectively the same party for the purposes of this lawsuit, Harris's Third-Party Complaint against Limestone is in essence a counterclaim against Hartford's original suit. Viewed analogously, Limestone's argument collapses, as it would effectively declare that Hartford's Complaint doubles as an answer to Harris's Counterclaim. Moreover, in the classic situation where the doctrine applies, the plaintiff has benefitted from a responsive pleading filed by *some* defendant, just not all of the defendants. In

7

this case, however, no party has formally responded to Harris's claims. Accordingly, even if Limestone's default were not imputable to Hartford, the Court did not err in entering default judgment against Limestone. Instead, it correctly declined to extend the common-defense doctrine beyond what its purpose, function, and underlying reasoning could withstand.

Having determined that default judgment was properly entered, the Court now turns to the second point of inquiry: whether the default should nonetheless be set aside. Rule 60(b) of the Federal Rules of Civil Procedure gives the district courts broad discretion to set aside a final order in the case of, as pertinent here, "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed. R. Civ. P. 60(b); *see also Jefferson v. Hicks*, 364 Fed. Appx. 281, 283 (8th Cir. 2010) (noting that the district courts have "broad discretion" on Rule 60(b) motions). This rule "authorizes an extraordinary remedy that allows a court to preserve the delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of all the facts." *Hoover v. Valley West D M*, 823 F.2d 227, 230 (8th Cir. 1987) (quotation omitted).

Though Limestone's Motion references the above-quoted provisions of Rule 60(b), it hardly explains how any mistake, inadvertence, surprise, or excusable neglect justifies relief, instead choosing to focus the near-entirety of its brief arguing that the Court erred by entering default judgment in the first place. Nonetheless, the Court is persuaded that it is appropriate for it to exercise its discretion to set aside the default judgment in the interest of justice. Under the rubric of Rule 60(b), the Court believes that Limestone's counsel—who is also Hartford's counsel—neglected to file a response to

8

Harris's Third-Party Complaint, and that the neglect was excusable. The Eighth Circuit has "identified two components of excusable neglect: (1) neglect or noncompliance (2) that is excusable." *U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873, 896 (8th Cir. 2015) (quotation and alteration omitted). Several factors go into determining whether conduct is excusable:

> (1) The danger of prejudice to the non-moving party; (2) the length of delay and its potential impact on judicial proceedings; (3) whether the movant acted in good faith; and (4) the reason for the delay, including whether it was within the reasonable control of the movant.

*Id.* (citing *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). In addition, "the existence of a meritorious defense [is a] relevant factor . . . ." *Union Pac. R. Co. v. Progress Rail Servs. Corp.*, 256 F.3d 781, 783 (8th Cir. 2001). To be sure, Rule 60(b) "does not permit litigants and their counsel to evade the consequences of their legal positions and litigation strategies, even though these might prove unsuccessful, ill-advised, or even flatly erroneous," 796 F.3d at 896 (quotation omitted), but if attorneys' actions are "not so gross as to be inexcusably negligent," district courts have discretion to grant relief. *Hoover*, 823 F.2d at 230.

Applying these factors, the Court finds that Limestone's neglect in failing to file a response to Harris's Third-Party Complaint was excusable. First, the danger of prejudice to Harris is minimal. "Setting aside a default must prejudice plaintiff in a . . . concrete way, such as loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion." *Stephenson v. El-Batrawi*, 524 F.3d 907, 915 (8th Cir. 2008) (quotation omitted). Setting aside the default against Limestone would cause no loss of evidence or opportunity for fraud and collusion. While discovery in this case has closed, any difficulty resulting from additionally granted discovery would be *de*

9

*minimis*, as the parties and issues in the case will remain essentially the same. Second, though the length of Limestone's delay was significant, it will have no impact on judicial proceedings. Trial in this case has been pushed back until March of 2016, giving Limestone time to file a responsive pleading, and giving the parties sufficient time to prepare for trial.[2]

Third, the Court that finds Limestone acted in good faith. Limestone/Hartford's counsel likely failed to file a response on behalf of Limestone because it erroneously believed that Limestone's default would not impact Hartford. While this belief was mistaken, it was not held in bad faith. Fourth, Limestone's Motion does not explain the reason for its delay, but, as stated above, the Court believes that the reason is clear enough. Limestone, as an apparently insolvent entity, has no real interest in this litigation. Instead it is Hartford, Limestone's surety, who is entitled to enforce Limestone's legal rights. Recognizing that Limestone is judgment-proof, and assuming that its default would not be imputed to Hartford, Hartford's counsel decided not to file a response on Limestone's behalf. It was only after Harris filed its Motion for Summary Judgment that Hartford's counsel realized the potential implications of its inaction, and filed an appearance for Limestone along with the instant Motion to Set Aside Default Judgment.

While the correct course of conduct would have been to respond to Harris's Third-Party Complaint in the first instance, this is a fairly nuanced area of common law. The relationship between attorneys and the common law is not one of a sage oracle

---

[2] The discovery deadline in this case was August 15, 2015. If a party believes that additional discovery time is necessary in light of this Order, it should file a motion with the Court requesting the additional time and detailing the basis for its request.

divining from his crystal ball. Instead, the Court expects that attorneys will exercise a reasonable level of competence and diligence to understand the law, and pursue the rights of their clients in accordance with it. When such efforts are exerted, this Court will be reluctant to sustain a default judgment when, all other factors being in favor of setting it aside, the reason for the delay was a reasonable misunderstanding of a nuanced area of substantive common law.[3]

Fifth and finally, Limestone has meritorious defenses to Harris's claims. Harris's claims against Limestone, and its defenses against Hartford, are both centrally premised on the idea that Limestone was responsible for the construction issues that occurred during the Cemetery expansion. Hartford's claims, on the other hand, are centrally premised on the idea that Harris was responsible for the construction issues. Underlying many of these claims are disputed issues of the material fact that will go to trial. Since Limestone's defenses are likely to be similar to Hartford's claims, and many of Hartford's claims will proceed to trial, it follows that Limestone's defenses are potentially meritorious.

For the reasons discussed herein, Limestone's Motion to Set Aside Default Judgment (Doc. 68) is **GRANTED**. Limestone is **ORDERED** to respond to Harris's Third-Party Complaint within **14 DAYS** from the entry of this Order. Limestone is further **ORDERED** to respond to Ark-Con's Crossclaim within **14 DAYS** from the entry of this Order.

---

[3] Indeed, Eighth Circuit courts have set aside default judgments for far worse conduct on the part of counsel. *E.g.*, *Hoover*, 823 F. 2d at 230 (upholding a district court's decision to set aside default judgment after counsel failed to discover the pending litigation against her client upon her return from vacation).

**B.  HARRIS'S MOTION FOR SUMMARY JUDGMENT**

Harris asks the Court to grant summary judgment on the claims brought against it by Hartford. Harris first bases its Motion for Summary Judgment on Limestone's default, which it argues should be imputed onto Hartford. However, since the Court has set aside Limestone's default, this aspect of Harris's Motion is moot. In the alternative, Harris argues that it is entitled to partial summary judgment on all claims related to the structural failure of the Building, on a group of claims that it has styled as the "*Res Ipsa*" claims, and on Hartford's cause of action for misrepresentation. The Court will address these issues in turn.

**1.  Summary Judgment Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway*

*Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### 2.  The Structural Failure of the Building

Hartford's claims against Harris sound in breach of contract, negligence, and misrepresentation. Harris argues that each of these claims include the essential element of proximate causation, and that Hartford cannot meet its burden of proof on that element when it comes to the structural failure of the Building. More specifically, Harris contends that there is no genuine issue of material fact that the difference between a 95% and a 98% compaction rate could not have proximately caused the Building's structural failure. Hartford counters primarily by asserting that the cause of the structural failure of the Building is not material to its claims, because even if the structure did not fail, it would have had to demolish it to ensure that the building pad complied with the 98% specification anyway.

 "Proximate cause is 'that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without the result would not have occurred.'" *Hiser v. XTO Energy Inc.*, 2012 WL 3542009 (E.D. Ark. Aug. 14, 2012) (quoting *Ashley County Ark. v. Pfizer, Inc.*, 552 F.3d 659, 666 (8th Cir. 2009)). "In Arkansas, proximate cause is generally a fact issue to be decided by a jury . . . . It

becomes a question of law for the court only if reasonable minds could not differ." *Id.* (citing *Ashley Cnty.*, 552 F.3d at 667) (quotation omitted).

Accepting, for purposes of this Order, the view that Hartford must prove that Harris proximately caused the structural failure of the Building,[4] the Court finds that genuine issues of material fact exist. As an initial matter, Harris's argument that there is no genuine issue of material fact that the discrepancy between a 95% and 98% compaction rate did not cause the structural failure of the Building is inapposite. That is a narrower issue than the one currently before the Court, because there are questions of fact as to whether the building pad was compacted to 95% in the first place. Consequently, there are genuine issues of fact as to whether a lower compaction rate caused the Building structure to fail, and whether Harris caused the lower compaction rate.

Although Ark-Con's testing found that the building pad was compacted to an above 95% rate, a thorough review of the record shows questions of fact regarding the adequacy of Ark-Con's testing.[5] The purported deficiencies leave open the possibility that sections of the pad were initially compacted below 95%. *See* Doc. 61-9, p. 25 ("There's a question in my mind as to whether the density testing was thorough enough, whether there were enough in number and whether they were done every day as they should have.") (Watson Dep.); Doc. 61-2, pp. 7-8 ("[I]f the project manager or the resident engineer or the testing company technician suspected inadequate compaction

---

[4] Based on how the Court resolves this Motion, it need not consider Hartford's view that the cause of the structural failure of the Building is irrelevant to its case.

[5] As mentioned in the paragraph below, these potential inadequacies are not necessarily the fault of Ark-Con. They may instead be attributable to the party or parties responsible for directing the frequency of Ark-Con's testing.

in any one or more locations, the standard of care would require additional testing of those areas in particular to determine if the work was in fact acceptable or not."); Doc. 70-8, p. 3 (implying that Harris did not test the northeast corner of the building pad, where the settlement occurred) (Buchanan Dep.). In addition, the record contains a report from MACTEC Engineering and Consulting that includes a table of *ex post facto* soil density and moisture rate testing. This report reveals compaction rates significantly lower than 95%, and moisture rates above the soil's optimal level. *See* Doc. 61-11, p. 2 (listing compaction rates as low as 84.8%). These results are furthered by a report from Newlin Consulting. The report states that the lower compaction rates are "of note" in determining the cause of the structural failure of the Building. (Doc. 61-3). Taken together, this all creates a factual issue as to whether compaction rates lower than 95% caused the structural failure of the Building. It also creates a factual issue as to whether the lower rates are attributable to Harris's earth-fill work, or instead to an intervening factor between the time when Harris performed the work and when the *ex post facto* testing occurred. *See* Doc 61-2 (discussing intervening factors that may have caused the structural failure of the Building).

Finally, if the building pad was initially under-compacted, there are genuine issues of material fact surrounding the question of who is responsible for that sub-par work: Harris, Ark-Con, Limestone, or other contractors. There is conflicting evidence on the record regarding (i) who was responsible for directing the frequency of Ark-Con's testing; (ii) who was responsible for ensuring that Ark-Con's testing metrics complied with the project specifications; and (iii) the scope of various parties' responsibilities for ensuring that the building pad complied with the project specifications. For example,

Harris's expert D.H. Watson argues that: "Limestone, MWC [an engineering firm] and Ark-Con all approved Harris's earthwork. If there were deficiencies in the earth-fill compaction, it was the responsibility of these parties to notify Harris." (Doc. 61-2, p. 11). On the other hand, Hartford's expert James Reddick contends that Harris had an affirmative obligation to inquire into the specific results of the testing. (Doc. 61-6, p. 85).

In conclusion, genuine issues of material fact surround the structural failure of the Building. A review of the record reveals an issue of fact as to whether the building pad was initially compacted to a 95% rate. This, in turn, raises several issues of material fact as to whether a lower rate could have caused the structural failure of the Building, what may have caused a lower compaction rate, and who would bear responsibility for a lower rate. Given these genuine issues of material fact, the Court declines to grant Harris summary judgment on this matter.

### 3.  The "*Res Ipsa*" Claims

Harris next moves for summary judgment on a group of issues that it has styled the "*Res Ipsa*" claims. This group is comprised of Hartford's claims related to (i) the administration-building sidewalk; (ii) the existing irrigation lines; (iii) the grading by the storage bins and storage building; (iv) the grading over the crypts; (v) the grading for both sides of "B" street; (vi) the inlet grates and yard inlets; (vii) the broken curbs; and (viii) the wiring to the bell tower. Harris styles these issues this way because it argues that Hartford must rely on the theory of *res ipsa loquitor* to prove them. Because Hartford cannot demonstrate that Harris had exclusive control over the work underlying these issues, Harris's argument continues, the application of *res ipsa loquitor* would fail as a matter of law. Consequently, Hartford's claims on these issues would fail as well.

16

As a preliminary matter, the Court disagrees with Harris's framing of these issues. It does not follow that if the doctrine of *res ipsa loquitor* cannot apply to Hartford's claims, then they must be dismissed. *Res ipsa loquitor* is but one way to prove negligence. It applies in certain circumstances because "the mere fact that an accident occurred is not evidence of negligence." *Schubert v. Target Stores, Inc.*, 369 S.W.3d 717, 719 (Ark. 2010). So, in order to "assist in the proof of negligence where the cause is connected with an instrumentality in the exclusive control of a defendant," the doctrine allows the finder of fact to presume negligence in certain situations. *Id.* at 720. *Res ipsa loquitor* is, in other words, an alternate way to prove negligence, available to plaintiffs in certain circumstances when they cannot make out a *prima facie* claim. As Hartford has not conceded that its claims depend on the doctrine, the question before the Court is whether Hartford can carry its burden on the underlying elements of its claims. If it cannot, only then would *res ipsa loquitor* potentially be relevant as to Hartford's negligence cause of action.

"To establish a prima facie case of negligence, [a plaintiff] must show that he sustained damages, that the defendants were negligent, and that such negligence was a proximate cause of his damages." *Mangrum v. Pigue*, 359 Ark. 373, 383 (2004). "Negligence is the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do. Proximate cause means a cause, which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred." *Id.* (internal citation omitted). In establishing negligence, a party cannot "rely upon inferences based on conjecture or speculation." *Id.*

Viewing the facts in the light most favorable to Hartford, the Court finds that genuine issues of material fact exist as to Hartford's claims based on the administration-building sidewalk, the existing irrigation lines, all of the grading issues, and the inlet grates. Regarding those issues, a reasonable jury could find in Hartford's favor. However, with respect to its claims based on the broken curbs and the wiring to the bell tower, Hartford has failed to raise specific facts that create genuine issues for trial. The Court will address each issue in order:

- **The Administration-Building Sidewalk:** Hartford claims that Harris is responsible for the costs of re-constructing the sidewalk because it was not graded at a slope allowable under the Americans with Disabilities Act. *See* Doc. 70-12, p. 5; Doc 61-6, pp. 107-111 (Reddick Dep.).[6] The record reveals that there were three contractors that worked on the sidewalk: Harris, Dickerson, and Cochran Concrete. The record also shows that Harris's last day on the job site was February 15, 2011, and that it was officially terminated by Limestone on April 19, 2011. The daily reports completed by MACTEC discuss problems with the sidewalk on May 9, 2011, and May 12, 2011. (Doc 61-13, pp. 49, 59). Viewed together, these documents create a question of fact as to whether Harris was the contractor that caused the alleged damages to the sidewalk. This question of fact is material because it goes directly to proving whether Harris was negligent, and whether its negligence proximately caused Hartford's damages.

- **The Existing Irrigation Lines:** Hartford's expert James Reddick alleges that Harris violated the industry's standard of care by damaging irrigation lines during

---

[6] Its claims may also rely on other issues with sidewalk, though the record is less than clear on that.

the performance of demolition work for a roadway. *See* Doc. 70-12, p. 7; Doc. 61-6, pp. 111-12 (Reddick Dep.). Harris attacks Reddick's conclusion that it was responsible for the damage. It argues that Reddick attributes the damage to Harris only because the earthwork in the area of the irrigation lines was within the scope of Harris's work, and that this is an insufficient basis for reaching his conclusion. The Court disagrees. Reddick's deposition testimony reveals that his conclusion is premised on his knowledge of the location of demolition work performed by Harris, and the condition of the irrigation system before and after that work was performed. While this may not be proof-positive of Harris's liability, it is certainly more than "conjecture or speculation." *Mangrum*, 359 Ark. at 383. Reddick's Report and deposition testimony create genuine issues of material fact as to whether Harris's demolition was performed negligently, and whether that negligence proximately caused the damages to the irrigation system.

- **The Grading Issues:** With respect to the grading by the storage bins and storage building, the grading over the crypts, and the grading for both sides of "B" Street, the record contains factual disputes as to: (i) the extent to which Harris was able to perform and finish grading work prior to its termination (Doc. 61-6, p. 103); and (ii) the extent to which the grading fell within Harris's scope of work and responsibilities in the first place. *E.g.*, Doc. 61-13, p. 2 (both Harris and Suhor Construction performing excavation work related to the crypt field); Doc. 61-5, p. 4 (grades were incorrect by the storage bins and storage building); Doc. 70-3, p. 11 (requiring, within the apparent scope of Harris's work, that slope grades "direct water away from buildings"); Doc. 61-13, p. 19 (Harris performed work

near the "B" Street entry); Doc. 70-13, p. 21 (noting grading issues with curbs and sidewalks); *see generally* Doc. 70-3 (listing certain contract specifications related to grading); Doc. 70-1 (including earthwork as part of Harris's responsibilities). These factual disputes go directly to the questions of whether Harris was negligent, and whether that negligence proximately caused Hartford's damages.

- **Inlet Issues:** Hartford asserts that Harris is responsible for replacing drain inlets that were not draining because they were not properly graded—i.e. water could not adequately flow downhill into the drains. Based on the record citations and reasons discussed in the "Curb Issues" section below, it is clear enough that Harris was not responsible for placing curbs and inlets. However, the problems with the inlets may have been caused—at least in part—by improper grading. Grading was, generally, within the scope of Harris's work. Complicating the matter somewhat is that the MACTEC Daily Report from March 18, 2011, states that "Cochran Concrete sent over one operator today to finish filling in some low spots on the roadway area to [sic] so that the curb and gutter crew can finish placing curb on Monday." (Doc. 61-13, p. 30). This indicates that Cochran Concrete may have held at least some responsibility for grading around the areas that they were installing curbs and inlets. Viewed against one another, the scope of Harris's contractual responsibilities and the March 18, 2011 MACTEC Daily Report create a genuine issue of material fact as to who was responsible for the grading that caused the inlet issues.

- **Curb Issues:** Hartford contends that Harris is responsible for the removal and replacement of poorly constructed curbs. The primary dispute between the parties with respect to this issue is whether it was included within the scope of Harris's work. Hartford's expert, James Reddick, asserts that it is within the scope. (Doc. 70-12, p. 9). However, Reddick's assertion is extremely conclusory, and after reviewing the record, the Court finds no evidence indicating that Harris was responsible for performing curb work. This is so for three reasons.

First, Harris's subcontract with Limestone does not appear to include curb work. The contract includes, within Harris's scope of concrete work, concrete porous pavers and concrete bollards. (Doc. 70-1, pp. 8-9). The contract then refers to the project specifications and states that Harris's scope of work includes "Division . . . 32 [of the specifications] . . . *as [it] relate[s] to the scope of your work.*" (Doc. 70-1, p. 8) (emphasis added). The project specifications for concrete porous pavers and concrete bollards appear in an entirely separate section of Division 32 than specifications for curbs and gutters. (Doc. 77-4). Accordingly, while Harris's contractually defined scope of work does include some concrete work, it does not appear to include curb work. (Doc. 70-1, pp. 8-9).

Second, this conclusion is bolstered by certain of the MACTEC Daily Reports. The January 5, 2010 Report lists Cochran Concrete as having completed "180 LF" of curb and gutter forms. It also states that Harris was not on site that day. (Doc. 61-13, p. 14). The March 18, 2011 Report then states that "there is approximately 15 LF of finished curbs and gutter that is not satisfactory

and will be rejected and replaced prior to completion of this phase." (Doc. 61-13, p. 30).

Third, the record includes an affidavit by Harris's Project Manager Jamie Brown, declaring that the scope of Harris's work did not include the relevant concrete work. The affidavit further declares that Harris did not subcontract with Cochran Concrete and had no supervisory authority over them.

Since Harris's subcontract apparently does not include curb work, and since there is no other evidence on the record indicating that it performed any— save the conclusory statements in the Reddick Report—Hartford has failed to carry its burden of proof on this issue.

- **The Wiring Issue:** At some point during construction, it appears that the wiring to a bell tower was damaged. Reddick's Report stops short of attributing this damage to Harris, instead stating that he could not confirm the allegations he had heard from others that Harris was responsible. *See* Doc. 70-12, p. 9 (stating that there was an allegation that Harris was the only one working in the relevant area, but that the allegation could not be confirmed by Reddick). Given this uncertainty, and the sheer lack of any additional evidence in the record that Harris was responsible for the damage to the wiring, Hartford has failed to carry its burden of proof on this issue: no reasonable jury could find for Hartford.

In sum, genuine issues of material fact exist, precluding an entry of summary judgment, on the administration building sidewalk issue, the existing irrigation lines issue, all of the grading issues, and the inlet issues. No genuine issues of material fact exist as to the curb issues and the wiring issue. Accordingly, summary judgment will be

granted on those two issues. For clarity's sake, the entry of summary judgment applies to both Hartford's negligence and its breach of contract causes of action.

### 4.  The Misrepresentation Claim

Harris moves for summary judgment on Hartford's misrepresentation cause of action, arguing that it cannot prove that Harris made misrepresentations about the compaction rate of the building pad. In its Response, Hartford counters that it can prove such misrepresentations, and additionally references misrepresentations related to concrete footings found underground on the construction site. In its Reply, Harris notes that Federal Rule of Civil Procedure 9(b) requires plaintiffs "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake," and that Hartford failed to mention the concrete footings issue in its Complaint when it alleged misrepresentation. Fed. R. Civ. P. 9(b). The Court will, accordingly, begin by resolving the parties' dispute over the propriety of the concrete footings claim, and then turn to whether Harris is entitled to summary judgment on the building pad issue.

Harris is correct that Hartford failed to plead with particularity a misrepresentation claim based on Harris's handling of the concrete footings. One of the primary purposes of the particularity requirement "is to facilitate a defendant's ability to respond to and to prepare a defense to a plaintiff's charges." *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir. 1985). The only particular circumstances referenced in Count II of the Complaint, the misrepresentation count, relate to the construction of the building pad. Allowing Hartford to now proceed with a misrepresentation claim based on other grounds would undermine the purpose of Rule 9(b). Therefore, to the extent that

Hartford intended to base its misrepresentation cause of action on the concrete footings issue, it is barred from doing so.

The Court now turns to the building pad issue. In Arkansas, the tort of misrepresentation must be proven by a preponderance of the evidence with respect to the following five elements:

> (1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance.

*Roach v. Concord Boat Corp.*, 317 Ark. 474, 476 (1994). Harris argues that Hartford cannot prove these elements for three reasons. First, it argues that it never made a misrepresentation to Limestone because it was Ark-Con, not Harris, that communicated the compaction rate of the building pad to Limestone. Second, Harris maintains that it had no knowledge that any representation was false, because it believed the compaction to be in compliance with the specifications. Third, Harris believes that Hartford cannot prove that any reliance on a representation made by Harris would be justifiable, because Limestone had the testing reports from Ark-Con showing that the compaction rate was 95%. Hartford counters that Harris was fully aware that its compaction did not meet the project's specifications and that Limestone relied on its contrary representation in moving forward with construction of the Building structure.

The Court finds that there is no genuine dispute as to any material fact and that Harris is entitled to judgment as a matter of law. Most damning to Hartford's case is its inability to prove that any reliance on Harris's alleged representations was justifiable. The MACTEC Daily Report from August 12, 2010, states that the "Arkcon testing results

are now being sent directly to Nate of Limestone Development." (Doc. 61-8). Ark-Con testing reports dated August 16, 2010, September 7, 2010, and September 20, 2010 all list the tested compaction rates of the building pad. (Doc. 61-7). It follows that these results were given directly to Limestone. Accordingly, it would not have been reasonable for Limestone to have relied on any representation made by Harris that the building pad was compacted to the 98% compaction rate listed in the project specifications. *See* Doc. 72, p. 23 (Hartford basing its misrepresentation argument on the theory that Harris was aware that it did not meet the 98% compaction rate but misrepresented that it did).

The Court additionally notes the dearth of evidence in the record indicating that Harris made any communications to Limestone about the compaction rate of the building pad, let alone a knowingly false statement about it. Given these shortcomings, Hartford has failed to carry its burden of proof on the elements of misrepresentation.

For the reasons discussed herein, Harris's Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART** as to the curb issues, the wiring issue, and the misrepresentation claim, and **DENIED IN PART** as to all of the remaining issues.

## C. ARK-CON'S MOTION FOR SUMMARY JUDGMENT

The Court now turns its attention to the final matter before it, Ark-Con's Motion for Summary Judgment. After being sued by Hartford, Harris filed its Amended Third-Party Complaint against Ark-Con for contribution and promissory estoppel. Ark-Con has now filed its Motion for Summary Judgment on these claims, arguing that Harris's theory of Ark-Con's liability is premised on Hartford's allegation that the discrepancy between a 95% and 98% compaction rate caused the Building structure to fail. Because summary

judgment against Hartford is proper given its inability to prove that the 3% discrepancy caused the failure, Ark-Con's reasoning follows, summary judgment should also be granted in its favor on that issue.

As the Court explained in Section B(2), *supra*, genuine issues of material fact remain about what caused the Building's structure to fail. Because these issues remain, and because they draw Ark-Con's liability to Harris directly into question, granting summary judgment in Ark-Con's favor would be improper. Ark-Con's Motion is, therefore, **DENIED**.

### III. CONCLUSION

For the reasons stated herein, the motions before the Court are adjudicated as follows:

- Limestone Development's Motion to Set Aside Default (Doc. 68) is **GRANTED**. Limestone is **ORDERED** to respond to Harris's Counterclaim within **14 DAYS** of the entering of this Order. Limestone is further **ORDERED** to respond to Ark-Con's Crossclaim within **14 DAYS** of the entering of this Order.

- The Harris Company of Fort Smith's Motion for Summary Judgment (Doc. 61) is **GRANTED IN PART** as to the curb issues, the wiring issue, and the misrepresentation claim, and **DENIED IN PART** as to all of the remaining issues.

- Ark-Con Testing Service's Motion for Summary Judgment (Doc. 64) is **DENIED**. **IT IS SO ORDERED** on this 12th day of November, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

26